No. 23-1860

# In the United States Court of Appeals for the Sixth Circuit

———

St. Joseph Parish St. Johns,

*Plaintiff-Appellant,*

*v.*

Dana Nessel, in her official capacity as Attorney General of Michigan; John E. Johnson, Jr., in his official capacity as Executive Director of the Michigan Department of Civil Rights; Portia L. Roberson, Zenna Faraj Elhason, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, David Worthams, and Luke R. Londo, in their official capacities as members of the Michigan Civil Rights Commission,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Western District of Michigan Southern Division, No. 1:22-cv-1154

## PLAINTIFF-APPELLANT'S OPENING BRIEF

William J. Haun
Lori H. Windham
Nicholas R. Reaves
Richard C. Osborne*
The Becket Fund
    for Religious Liberty
1919 Pennsylvania Ave. NW
    Suite 400
Washington, DC 20006
(202) 955-0095
*whaun@becketlaw.org*

\* Not admitted to the D.C. Bar;
admitted only in New Jersey.
Supervised by licensed D.C. Bar
members.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1860                    Case Name: St. Joseph Parish St. Johns vs. Dana Nessel, et al.

Name of counsel: William J. Haun

Pursuant to 6th Cir. R. 26.1, St. Joseph Parish St. Johns
*Name of Party*
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

## CERTIFICATE OF SERVICE

I certify that on _____ November 29, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/William J. Haun

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

Page 1 of 2

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a) **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed**.

(1) Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS AND
FINANCIAL INTEREST ...................................................................i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT............................1

STATEMENT OF JURISDICTION..........................................................2

STATEMENT OF ISSUES....................................................................3

INTRODUCTION ...............................................................................4

STATEMENT OF THE CASE ...............................................................7

   I.   St. Joseph's Catholic mission .......................................................7

   II.  Michigan expands ELCRA and refuses religious
       accommodations ..................................................................9

       A.   Defendants' five-year effort to expand ELCRA .....................9

       B.   Investigation and litigation against religious entities is
           underway ...............................................................14

   III.  The new ELCRA allows anyone to sue St. Joseph .....................15

   IV.  The district court's decision....................................................19

SUMMARY OF ARGUMENT ...............................................................20

STANDARD OF REVIEW....................................................................23

ARGUMENT ....................................................................................23

   I.   Under the new ELCRA, St. Joseph has standing and its
       claims are ripe..................................................................23

A.  St. Joseph's conduct is arguably affected with a
constitutional interest............................................................24

B.  The new ELCRA arguably proscribes St. Joseph's
conduct...................................................................................26

  1.  The new ELCRA arguably prohibits St. Joseph's
  religious exercise. .............................................................27

  2.  The district court conflated standing with the
  merits. ................................................................................33

C.  St. Joseph faces a credible threat of enforcement. ...............43

  1.  Given Michigan's refusal to disavow enforcement,
  enforcement is presumed. .................................................44

  2.  Even if the *McKay* factors apply, St. Joseph
  meets them. ........................................................................49

II.  Declaratory and injunctive relief are appropriate remedies.......55

CONCLUSION ........................................................................57

CERTIFICATE OF COMPLIANCE ......................................................58

CERTIFICATE OF SERVICE.................................................................59

DESIGNATION OF RELEVANT DISTRICT
COURT DOCUMENTS ...........................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Case**

*303 Creative LLC v. Elenis,*
  6 F.4th 1160 (10th Cir. 2021) ............................................... 44

*Ariz. Right to Life PAC v. Bayless,*
  320 F.3d 1002 (9th Cir. 2003) ............................................... 44

*Assemany v. Archdiocese of Detroit,*
  434 N.W.2d 233 (Mich. Ct. App. 1998) ................................. 41

*Babbitt v. United Farm Workers Nat. Union,*
  442 U.S. 289 (1979) ............................................................ 50-51

*Barber v. Charter Twp. of Springfield,*
  31 F.4th 382 (6th Cir. 2022) ........................................ 26, 34

*Barilla v. City of Houston,*
  13 F.4th 427 (5th Cir. 2021) ................................................ 44

*Birmingham v. Nessel,*
  No. 21-1297, 2021 WL 5712150
  (6th Cir. Dec. 2, 2021) ......................................................... 38

*Block v. Canepa,*
  74 F.4th 400 (6th Cir. 2023) ................................... 33, 52, 53

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ......................................................... 13

*Braidwood Management, Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023) .................................... 48, 49, 51

*Brown v. Kemp,*
  No. 21-1042, 2023 WL 7489920
  (7th Cir. Nov. 13, 2023) ....................................................... 26

*Bryant v. Woodall,*
1 F.4th 280 (4th Cir. 2021) ..........................................44, 50

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ...................................................37

*Cal. Trucking Assoc. v. Bonta,*
996 F.3d 644 (9th Cir. 2021)..............................................50

*Carey v. Wolnitzek,*
614 F.3d 189 (6th Cir. 2010)..............................................26

*Carson v. Makin,*
596 U.S. 767 (2022) ...................................................25

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ...................................................40

*Ciurleo v. St. Regis Parish,*
214 F. Supp. 3d 647 (E.D. Mich. 2016) ................................39

*Clark v. Martinez,*
543 U.S. 371 (2005) ...................................................39

*Conlon v. InterVarsity Christian Fellowship,*
777 F.3d 829 (6th Cir. 2015)....................................29-30, 42

*Connection Distrib. Co. v. Holder,*
557 F.3d 321 (6th Cir. 2009)..............................................38

*Corp. of Presiding Bishop of Church of Jesus
Christ of Latter-day Saints v. Amos,*
483 U.S. 327 (1987) ..............................................13, 30, 48

*Dambrot v. Cent. Mich. Univ.,*
55 F.3d 1177 (6th Cir. 1995)....................................34-35, 38

*Doster v. Kendall,*
54 F.4th 398 (6th Cir. 2022) ...........................................35

*Duquesne Univ. of the Holy Spirit v. NLRB,*
947 F.3d 824 (D.C. Cir. 2020) ...........................................30

*Elrod v. Burns,*
  427 U.S. 347 (1976) .................................................................50-51, 56

*Fed. Election Comm'n v. Cruz,*
  596 U.S. 289 (2022) ..................................................................41-42, 43

*Fellowship of Christian Athletes v. San Jose*
  *Unified Sch. Dist. Bd. of Educ.,*
  82 F.4th 664 (9th Cir. 2023) ............................................................. 29

*Fischer v. Thomas,*
  52 F.4th 303 (6th Cir. 2022) ............................................................. 46

*Dep't of C.R. ex rel. Forton v. Waterford Twp.*
  *Dep't of Parks & Recreation,*
  387 N.W.2d 821 (Mich. 1986) ........................................................... 37

*Fox v. Saginaw County,*
  35 F.4th 1042 (6th Cir. 2022) ........................................................... 56

*Franciscan Alliance, Inc. v. Becerra,*
  47 F.4th 368 (5th Cir. 2022) ....................................................... 36, 51

*Friends of Georges v. Mulroy,*
  No.2:23-cv-2163, 2023 WL 3790583
  (W.D. Tenn. June 2, 2023) ................................................................ 38

*Fulton v. City of Philadelphia,*
  141 S. Ct. 1868 (2021) ...................................................................... 29

*Harrell v. Florida Bar,*
  608 F.3d 1241 (11th Cir. 2010) ......................................................... 44

*Hays v. City of Urbana,*
  104 F.3d 102 (7th Cir. 1997) ............................................................. 44

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) ...................................................................26, 35-36

*Hosanna-Tabor Evangelical Lutheran Church*
  *and Sch. v. EEOC,*
  565 U.S. 171 (2012) ............................................................24-25, 40-41

*InterVarsity Christian Fellowship/USA v.*
  *Bd. of Governors of Wayne State Univ.,*
  534 F. Supp. 3d 785 (E.D. Mich. 2021) ...............................................56

*Italian Colors Rest. v. Becerra,*
  878 F.3d 1165 (9th Cir. 2018)...............................................................53

*Kentucky v. Yellen,*
  54 F.4th 325 (6th Cir. 2022) ................................................................39

*Mangual v. Rotger-Sabat,*
  317 F.3d 45 (1st Cir. 2003) ..................................................................43

*McKay v. Federspiel,*
  823 F.3d 862 (6th Cir. 2016)....................................................45, 49, 53

*N.H. Right to Life PAC v. Gardner,*
  99 F.3d 8 (1st Cir. 1996) ......................................................................44

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022)..........................................................................41

*NLRB v. Catholic Bishop of Chicago,*
  440 U.S. 490 (1979).....................................................................*passim*

*NRA v. Magaw,*
  132 F.3d 272 (6th Cir. 1997)..........................................................38, 46

*Ohio Citizen Action v. City of Englewood,*
  671 F.3d 564 (6th Cir. 2012)...........................................................14-15

*Online Merchs. Guild v. Cameron,*
  995 F.3d 540 (6th Cir. 2021)....................................................45, 46, 53

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
  140 S. Ct. 2049 (2020)..............................................................25, 30, 41

*Peck v. McCann,*
   43 F.4th 1116 (10th Cir. 2022) .................................................... 43, 50

*People v. Skinner,*
   917 N.W.2d 292 (Mich. 2018) ............................................................ 39

*Picard v. Magliano,*
   42 F.4th 89 (2d Cir. 2022) ............................................................ 26, 39

*Planned Parenthood of Central N.J. v. Farmer,*
   220 F.3d 127 (3d Cir. 2000) ................................................................ 44

*Platt v. Bd. of Comm'rs on Grievances and
   Discipline of Ohio Sup. Ct.,*
   769 F.3d 447 (6th Cir. 2014) ...................................................... *passim*

*Powell v. McCormack,*
   395 U.S. 486 (1969) ............................................................................ 56

*Religious Sisters of Mercy v. Azar,*
   513 F. Supp. 3d 1113 (D.N.D. 2021) .................................................. 36

*Religious Sisters of Mercy v. Becerra,*
   55 F.4th 583 (8th Cir. 2022) ........................................................ 36, 51

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) ............................................................................ 25

*Rouch World, LLC v. Dep't of C.R.,*
   987 N.W.2d 501 (Mich. 2022) ...................................................... 11, 13

*Speech First, Inc. v. Schlissel,*
   939 F.3d 756 (6th Cir. 2019) ....................................................... 52, 53

*St. Paul Area Chamber of Commerce v. Gaertner,*
   439 F.3d 481 (8th Cir. 2006) .............................................................. 44

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ..................................................................... *passim*

*Thomas More L. Ctr. v. Obama,*
   651 F.3d 529 (6th Cir. 2011) .............................................................. 27

*Turtle Island Foods, S.P.C. v. Strain,*
   65 F.4th 211 (5th Cir. 2023) ...................................................... 26

*Universal Life Church Monastery Storehouse v. Nabors,*
   35 F.4th 1021 (6th Cir. 2022) ........................................... 23, 46

*Virginia v. Am. Booksellers Assoc., Inc.,*
   484 U.S. 383 (1988) ................................................................ 44

*Vitagliano v. County of Westchester,*
   71 F.4th 130 (2d Cir. 2023)..................................................... 44

*Weishuhn v. Catholic Diocese of Lansing,*
   756 N.W.2d 483 (Mich. Ct. App. 2008)...........................40-41

*Winter v. Wolnitzek,*
   834 F.3d 681 (6th Cir. 2016).................................................. 24

*Women's Med. Pro. Corp. v. Baird,*
   438 F.3d 595 (6th Cir. 2006).............................................55-56

## Statutes

28 U.S.C. § 1291.............................................................................2

28 U.S.C. § 1331.............................................................................2

28 U.S.C. § 1343.............................................................................2

42 U.S.C. § 1983.............................................................................2

42 U.S.C. § 2000bb-3 ...................................................................35

MCL § 37.2102.................................................................................9

MCL § 37.2102...............................................................................32

MCL § 37.2201...............................................................................28

MCL § 37.2202...............................................................................28

MCL § 37.2206...............................................................................28

MCL § 37.2208 ........................................................................... 16,, 30, 42

MCL § 37.2301 ............................................................................... 31

MCL § 37.2302 ..................................................................... 17, 32, 37

MCL § 37.2401 ............................................................................... 31

MCL § 37.2403 ............................................................................... 31

MCL § 37.2705 ............................................................................... 36

MCL § 37.2801 ............................................................................... 53

## Other Authorities

*Declaratory Ruling on Contraceptive Equity*, Michigan Civil
    Rights Commission (Aug. 21, 2006) .................................................... 37

Lauren Edwards, *Former Calvin professor sues university
    under Elliott Larsen Civil Rights Act*, FOX 17: West
    Michigan (Apr. 19, 2023) ...................................................... 14

Fed. R. Evid. 201 ....................................................................... 14

Kate Wells, *Family says Catholic medical clinic denied
    transgender girl care*, Michigan Radio (Sept. 6, 2023) ........................ 14

Mich. Admin. Code R. 37.25 .................................................... 16-17

MCRC Annual Report (2022) .................................................... 52

MCRC Annual Report (2020-21) ............................................... 52

5 Mich. Civ. Jur. Civil Rights § 21 ........................................ 36-37

*Parish Mission Statement*, St. Joseph Catholic Church ........................... 7

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case presents important questions about pre-enforcement standing in the First Amendment context. It involves a district court's decision to reject standing on grounds that entangle government with a church's internal religious decisions affecting its faith and mission. Oral argument would illuminate these issues, and thereby aid the Court in resolving this matter. *See* Fed. R. App. P. 34. Accordingly, St. Joseph respectfully requests oral argument.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arose under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final order of dismissal. The district court dismissed St. Joseph's complaint and entered final judgment on August 22, 2023. Opinion, R. 58, Page ID # 1156-1182; Judgment, R. 59, Page ID # 1183. St. Joseph timely filed its notice of appeal on September 19, 2023. Notice of Appeal, R. 60, Page ID # 1184-1185.

## STATEMENT OF ISSUES

I.    Whether the district court erred by holding that St. Joseph did not have pre-enforcement standing to bring a First Amendment challenge against the new ELCRA.

II.   Whether the district court erred by holding that St. Joseph's claims were unripe because it lacked pre-enforcement standing.

## INTRODUCTION

St. Joseph is a Roman Catholic parish and school in St. Johns, Michigan. St. Joseph seeks to preach, teach, advocate, and pass on the Catholic faith in all activities at its parish and school.

But thanks to a change in Michigan law, all of St. Joseph's employment, educational, and publicly open activities are subject to liability whenever they uphold the Catholic understanding of human sexuality, gender, or marriage. As the district court held, St. Joseph's religious exercise, speech, and assembly "may fall within the purview" of the newly amended Elliott-Larsen Civil Rights Act ("ELCRA"). Michigan Attorney General Dana Nessel said that ELCRA was amended to "enshrine" against "future legal attacks" her ability, and that of the Department of Civil Rights, and the Civil Rights Commission ("Defendants" or "Michigan") to penalize religious objectors who could not endorse same-sex marriage or gender transitions. Religious objectors to the new orthodoxy "are bigots," says Nessel. So, their views are now verboten under the new ELCRA provisions—enacted without "any amendments that would seek to reduce their scope or impact," according to Defendant Michigan Commission on Civil Rights. Moreover, Defendants admit that the new ELCRA is so "broad" that it would be "impossible" to disavow enforcement against St. Joseph.

Despite all this, the district court denied St. Joseph pre-enforcement standing to protect its First Amendment rights. That is reversible error,

because it violates the U.S. Supreme Court's three-part test for pre-enforcement standing in *Susan B. Anthony List v. Driehaus*. Under *SBA List*, plaintiffs have pre-enforcement standing whenever they show their intended conduct is (1) arguably affected with a constitutional interest, (2) arguably proscribed by the statute at issue, and (3) subject to a credible threat of enforcement. Here, nobody disputes that St. Joseph meets *SBA List* step one. St. Joseph is engaged in core religious exercise: worshipping and handing on the faith. But the district court erred on step two ("arguably proscribed") and step three ("credible threat").

First, the district court erred on *SBA List* step two ("arguably proscribed"). There, the district court conflated St. Joseph's standing to sue with the merits of its claims. Although the district court admitted that St. Joseph "may fall within the purview of the ELCRA" in all the ways St. Joseph said—which is all that's required for conduct to be "arguably" proscribed—the district court went on to speculate whether the new ELCRA could be "construed" to protect St. Joseph's religious freedom anyway. This turned "arguably" proscribed into "actually" proscribed. And it allows a district court to dismiss on standing grounds any claim it deems unmeritorious. This is reversible error.

Second, equally erroneous is the district court's refusal to find a credible threat of enforcement (*SBA List* step three). Here, it should have been easy to find a credible threat. Courts presume a credible threat of enforcement when a new statute covers a plaintiff's conduct, and the

5

state refuses to disavow enforcement. This is exactly St. Joseph's predicament. But the district court deemed disavowal irrelevant, because ELCRA makes so much of St. Joseph's conduct illegal. The perverse incentive this gives to governments to prevent pre-enforcement challenges by penalizing broad swaths of conduct is alone reason for reversal. And it proves the virtue of the enforcement presumption embraced by circuits nationwide.

Instead of applying that consensus position, the district court suggested a circuit split exists based on its own overextension of *McKay v. Federspiel*. That was wrong too. As this Court has explained, the *McKay* factors are not a "laundry list" that mechanically apply to every case. Even if *McKay* applies here, its factors demonstrate the credible threat.

Finally, the district court's *SBA List* errors underscore deeper First Amendment problems. According to the district court, St. Joseph's pre-enforcement standing is conditioned on first seeing whether Michigan will respect St. Joseph's religious liberty—after Michigan investigates or prosecutes St. Joseph. In the meantime, if St. Joseph is concerned about an employment discrimination lawsuit, St. Joseph can use the "form of redress" that "ELCRA expressly provides." That is, at five-year increments, St. Joseph can try convincing the Civil Rights Commission that it is "reasonably necessary" for every St. Joseph employee—even

First Amendment "ministers"—to uphold Catholic teaching. This is obviously wrong.

"Good intentions by government" regulators are not, as the Supreme Court said in *NLRB v. Catholic Bishop*, what prevents state entanglement with religion. Nothing in Article III requires St. Joseph to first see if Michigan will give the church permission to exercise its First Amendment rights before it sues to protect them. Concluding otherwise chills First Amendment rights and negates the point of pre-enforcement standing. St. Joseph has standing, and its claims for declaratory and injunctive relief are therefore ripe. The district court should be reversed.

## STATEMENT OF THE CASE

### I. St. Joseph's Catholic mission

St. Joseph is a parish in the Roman Catholic Diocese of Lansing located in St. Johns, Michigan. Second Amended Complaint ("SAC"), R. 40, Page ID # 659. St. Joseph is "called to worship God and proclaim God's Word by living the Good News of Our Lord Jesus Christ" and to "accept the responsibility to serve, rather than be served, in our parish, community, and beyond." *Parish Mission Statement*, St. Joseph Catholic Church, https://perma.cc/BD7W-KQDW.

Since 1924, St. Joseph has operated a Catholic elementary school, providing a religious education to approximately 200 children each year. R. 40, Page ID # 669-670. St. Joseph believes "that a relationship with God should be fully integrated into the life of every student" and that its

school exists "to assist parents in the spiritual, social, and intellectual development of their child within the framework of Catholic teachings and moral values." R. 40, Page ID # 670. The Catholic faith is thus "interspersed throughout the classroom curriculum," including through weekly Mass, Eucharistic adoration, and liturgical prayer celebrations. R. 40, Page ID # 670-671.

In keeping with St. Joseph's Catholic mission, and as required by the Diocese, all St. Joseph employees (at both the school and parish) must be practicing Catholics, "exemplify the moral teachings of the Catholic Church," and "not teach, advocate, model, or in any way encourage beliefs or behaviors that are contrary to the teaching of the Catholic Church"—including the Church's teaching on gender, sexuality, and marriage. R. 40, Page ID # 671. The Diocese also requires that "all Catholic parishes, schools, … and any subdivision thereof, shall respect the biological sex of the human person as given by God and shall apply all policies and procedures in relation to that person according to that person's God-given biological sex." R. 40, Page ID # 673. The Diocese further requires that "[s]tudents [of Diocesan schools] and [their] parents (or legal guardians) shall conduct themselves in accord with their God-given biological sex." R. 40, Page ID # 673. Teachers must make comparable commitments. Diocesan guidelines require that any teachers at a Diocesan school—or those applying to teach at a Diocesan school—sign an agreement

confirming that their conduct will be consistent with Catholic teaching. R. 40, Page ID # 673-674. St. Joseph complies with these policies.

As required by its religious beliefs, St. Joseph treats all men, women, boys, and girls according to their biological sex—including in dress, personal pronouns, participation in sports teams, use of bathrooms, locker rooms, or other single-sex spaces. R. 40, Page ID # 670-675. St. Joseph consistently upholds its Catholic identity and expects all those who make use of its facilities (including private tutors or teachers from the local school district) to respect this Catholic environment. R. 40, Page ID # 675.

## II. Michigan expands ELCRA and refuses religious accommodations

### A. Defendants' five-year effort to expand ELCRA

Michigan's new ELCRA did not just emerge. During the preceding five years, Defendants here reinterpreted and expanded the definition of "sex" under the old ELCRA to include sexual orientation and gender identity. R. 40, Page ID # 676-688. Defendants ensured that, unlike Title VII and many other states, Michigan's law would not protect religious objectors. Defendants' campaign culminated in the new ELCRA signed into law on March 16, 2023. *See* R. 40, Page ID # 680, 687. The new ELCRA adds "sexual orientation, gender identity or expression" to the list of protected categories—and by design omits any religious accommodation. MCL § 37.2102, as amended by 2023 Mich. Pub. Acts 6.

The campaign to change ELCRA began in May 2018. Defendant
Michigan Civil Rights Commission reinterpreted ELCRA's prohibition on
discrimination "because of sex." R. 40, Page ID # 676-677. Before the
Commission's reinterpretation, ELCRA prohibited discrimination
"because of … sex" by employers, places of public accommodation, and
educational institutions. R. 40, Page ID # 676. But the Commission
reinterpreted "sex" to include sexual orientation and gender identity. R.
40, Page ID # 676-677. Immediately after reinterpreting "sex," the
Commission "began accepting and investigating complaints of
discrimination on the basis of gender identity and sexual orientation." R.
40, Page ID # 677.

Complaints surged. "From the time of the Commission's vote through
the end of 2019, [the Michigan Department of Civil Rights] ha[d] taken
73 complaints on the basis of sexual orientation and gender identity." R.
40, Page ID # 677. By way of comparison, in year prior to the
Commission's interpretive statement (FY2017), there were 299 sex
discrimination complaints. R. 40, Page ID # 678. After the Commission's
reinterpretation, the number of "sex" discrimination complaints
increased to 424 in FY2018, 489 in FY2019, 632 in FY2020, 573 in
FY2021, and 905 in FY2022 (a 202% increase and the highest number on
record). R. 40, Page ID # 678.

Defendants prosecuted religious objectors and took their
reinterpretation to the Michigan Supreme Court. The case, *Rouch World*,

considered Defendants' reinterpretation of "sex" discrimination against two small businesses who claimed that ELCRA enforcement "would violate their sincerely held religious belief[s]." *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 505 (Mich. 2022).

The Michigan Supreme Court adopted Defendants' ELCRA reinterpretation, holding that "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of the ELCRA." *Id.* at 513. The Court did not decide whether discrimination based on gender identity is also proscribed. *Id.* at 505-06. "[D]epart[ing] from the normal principle that courts will first consider whether an interpretation raises grave constitutional doubts before adopting [it]," the Michigan Supreme Court adopted this new interpretation "without any concern for whether that interpretation violates constitutional protections of religious liberty." *Id.* at 556 (Viviano, J., dissenting). And unlike Title VII, "[i]t does not appear that there are any such statutory provisions applicable to the ELCRA" that would account for religious liberty here. *Id.* Justice Viviano predicted that "[t]he results will be significant for Michigan, as the scope of the ELCRA extends far beyond" Title VII. *Id.*

Following their judicial victory, Defendants lobbied the Michigan Legislature to, in the words of General Nessel, "help [*Rouch World*] withstand future legal attacks" by "enshrin[ing]" it into ELCRA. R. 40, Page ID # 661. Nessel deemed this "imperative," *id.*, elsewhere

explaining that "[p]eople who choose" to exercise the religious beliefs about human sexuality and gender that she disagrees with in "employment, housing, educational opportunities, medical treatment or goods or services … are not religious heroes, they are bigots." R. 40, Page ID # 681-682. And in January 2023, the Michigan Civil Rights Commission passed a resolution in support of adding sexual orientation and gender identity as protected ELCRA categories "without any amendments that would seek to reduce their scope or impact." R. 40, Page ID # 685.

The Michigan Senate then passed this proposed ELCRA change while rejecting repeated calls for religious accommodations. Senator Jeremy Moss, the lead sponsor, said in a committee hearing, "I don't think it is appropriate to allow the government to let religion discriminate against someone because of their sexual orientation or gender identity." R. 40, Page ID # 685-686. And Senator Jeff Irwin rejected calls for a religious accommodation, explaining that a religious exemption "represents a license to discriminate" and "[t]hat's what we've seen from folks time and time again, from folks who have tried to say that they should have a religious exemption from the law that protects people against discrimination, … I just think that's fundamentally wrong." R. 40, Page ID # 686. Other senators made similar claims, insisting that religious accommodations should be rejected because "[d]iscrimination is never okay." R. 40, Page ID # 686. The expansion of ELCRA—without any

religious accommodations—passed the Senate on March 1, 2023, and the House on March 8, 2023. Governor Gretchen Whitmer signed the legislation into law eight days later. R. 40, Page ID # 687.

Under the new ELCRA, it is unlawful to discriminate based on either "sexual orientation" or "gender identity or expression" in employment, public accommodations, and educational institutions. R. 40, Page ID # 687. This is narrower than the religious freedom rights recognized in Title VII, which categorically prohibits certain employment discrimination actions against religious employers. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987) (explaining exemption's purpose is "to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions."). Similarly, when Title VII's prohibition on "sex" discrimination was reinterpreted to include sexual orientation and gender identity, the Supreme Court articulated ways in which some religious freedom protections "might supersede" Title VII. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020); *see also id.* (expressing "deep[] concern[] with preserving the promise of the free exercise of religion"). No such caveats exist in the new ELCRA (or *Rouch World*). *See Rouch World*, 987 N.W.2d at 556 (Viviano, J., dissenting). Rather, "the [Michigan Civil Rights] Commission has yet to issue a formal policy or interpretive statement following the amendment." Opinion, R. 58, Page ID # 1161. Even so,

Michigan says "[i]t is impossible for Defendants to disavow application of a statute as broad as the ELCRA to St. Joseph," because "the religious freedom inquiry would be so fact dependent." R. 44, Page ID # 845.

### B. Investigation and litigation against religious entities is underway

Soon after the new ELCRA was enacted, enforcement against religious entities began. The Civil Rights Commission is now investigating Catholic Charities of Shiawassee and Genesee Counties—which, like St. Joseph, is part of the Diocese of Lansing—in response to a gender identity discrimination complaint under ELCRA. Plaintiff's Brief in Opposition, R. 47, Page ID # 882. Similarly, Michigan is also investigating Emmaus Health Partners, a Catholic health care provider, for alleged gender-identity discrimination under the new ELCRA. Kate Wells, *Family says Catholic medical clinic denied transgender girl care*, Michigan Radio (Sept. 6, 2023), https://perma.cc/AH9G-7LTF. Private enforcement is underway too. Within a month of the new ELCRA's enactment, a former Calvin University employee sued the school for sexual orientation discrimination after he officiated a same-sex wedding. Lauren Edwards, *Former Calvin professor sues university under Elliott Larsen Civil Rights Act*, FOX 17: West Michigan (Apr. 19, 2023), https://perma.cc/LX5R-8DMU. The existence of these investigations and lawsuits is "not subject to reasonable dispute," Fed. R. Evid. 201(b), so this court "may certainly

take judicial notice" of them, *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 579 (6th Cir. 2012).

## III. The new ELCRA allows anyone to sue St. Joseph

The new ELCRA threatens to impose liability on St. Joseph for abiding by its religious commitments and upholding its religious mission in three areas: employment, public accommodations, and education.

***Employment.*** Consistent with its religious identity, St. Joseph only hires people who will follow the Catholic Church's religious beliefs and requires employees to reaffirm that commitment. This is a recurring situation, as St. Joseph regularly needs to hire new teachers—as well as other parish employees. *See* R. 40, Page ID # 696-697 (first-grade teacher, faith formation employee, private tutors to assist faith formation). Candidates for these positions—like all St. Joseph parish and school employees—are expected to abide by St. Joseph's religiously mandated policies. R. 40, Page ID # 696.

But St. Joseph risks liability by advertising or recruiting for these openings under the new ELCRA, which prohibits St. Joseph from even advertising its religious job requirements to those it seeks to hire. R. 40, Page ID # 695-697. St. Joseph is also prohibited from declining to hire (or discharging) individuals based on their religion or their compliance with Catholic teachings on human sexuality. R. 40, Page ID # 694-695. The new ELCRA thus threatens St. Joseph for its religiously mandated hiring practices. R. 40, Page ID # 697.

15

***The BFOQ Process.*** ELCRA provides bona fide occupational qualification ("BFOQ") exceptions to its antidiscrimination provisions for only those employees who are "'reasonably necessary to the normal operation of the business or enterprise[.]'" R. 58, Page ID # 1170 (quoting MCL § 37.2208). But the process to obtain and maintain those exemptions infringes upon St. Joseph's rights under the First Amendment.

If St. Joseph wants any of its employees—including its pastoral staff, its principal, teachers, and catechists—to uphold the Catholic understanding of human sexuality, St. Joseph now must first "establish[] that," for each employee for whom St. Joseph seeks an exemption, it "is reasonably necessary to the normal operation of" St. Joseph. MCL § 37.2208. This would allow St. Joseph to receive a BFOQ to uphold its Catholic understanding of sexuality—on an employee-by-employee basis. This "provides the Department [of Civil Rights] with authority to make individualized exemptions for employers." R. 58, Page ID # 1158. If St. Joseph does not receive such a BFOQ, it "shall have the burden" of meeting the same standard against anyone who sues it. *See* MCL § 37.2208. In response to any BFOQ request, the Civil Rights Commission "may direct the department to investigate *any* matter deemed relevant to an application," and St. Joseph must "make available *all* records, documents, data, or other information requested"—otherwise its request will be denied. Mich. Admin. Code R. 37.25(2) (emphasis

16

added). And even if St. Joseph completes this onerous task—again, on an employee-by-employee basis—the BFOQ exemption is "effective for not more than 5 years." *Id.* at 37.25(4). So, every five years, St. Joseph would need permission to continue applying the Catholic understanding of human sexuality to that employee. St. Joseph has not sought any BFOQs.

***Public accommodations.*** St. Joseph also arguably falls within the broad definition of a public accommodation under Michigan law because it opens its facilities to the public. R. 40, Page ID # 688. St. Joseph's church is open to all; anyone can attend Mass or witness other sacramental celebrations. R. 40, Page ID # 689. St. Joseph also participates in sports leagues open to all, and those leagues make use of St. Joseph's fields and gymnasium. R. 40, Page ID # 689. And St. Joseph is planning to host private tutors to help public-school children that attend its parish improve their reading skills as they prepare for sacraments. R. 40, Page ID # 689. Because it engages in the above activities consistent with its Catholic beliefs, St. Joseph faces an imminent threat of liability under the new ELCRA, which now prohibits public accommodations from denying any individual the "full and equal enjoyment" of its "facilities" because of sex, sexual orientation, or "gender identity or expression." R. 40, Page ID # 689; MCL § 37.2302(a), as amended by 2023 Mich. Pub. Acts 6. This could apply to facilities such as bathrooms and locker rooms in parish and school buildings, as well as the conduct of sports leagues who use the gym and fields.

17

*Education.* St. Joseph school participates in "shared time" arrangements for local public-school teachers to teach St. Joseph students in St. Joseph classrooms. R. 40, Page ID # 689. St. Joseph expects such teachers to respect its Catholic environment by, among other things, dressing and otherwise acting in accord with their biological sex.

St. Joseph also reviews school applications from new families. R. 40, Page ID # 664. Every family that sends a child to St. Joseph's school must enter a "Family – School Agreement," in which parents affirm the school's Catholic identity, acknowledge that "openly hostile or persistent defiance of Catholic truths or morality are a violation of what our school stands for," and attest the school's expectation that families are "to live their lives in a way that supports, rather than opposes, the mission of our school and our faith beliefs." R. 40, Page ID # 671-672. St. Joseph also follows the Diocese of Lansing's Policy on the Human Body, which requires that "[s]tudents [who attend Diocesan schools] and [their] parents (or legal guardians) shall conduct themselves in accord with their God-given biological sex." R. 40, Page ID # 673.

The new ELCRA also threatens St. Joseph's ability to recruit and select students in accordance with these religious requirements. For instance, St. Joseph could be sued by public-school "shared time" teachers or private tutors who want to dress or act inconsistently with their biological sex or take down religious imagery in the school's classroom

where they teach. Similarly, it is unlawful for educational institutions like St. Joseph to exclude or otherwise discriminate against an enrolled or prospective student based on "sexual orientation," or "gender identity or expression." R. 40, Page ID # 700-701. Nor may St. Joseph seek to elicit information about an applicant's religion or willingness to comply with Catholic teaching on human sexuality as part of the school's admission process. R. 40, Page ID # 700. In fact, St. Joseph may not even advertise such a preference or limitation. R. 40, Page ID # 700. In short, the new ELCRA prevents St. Joseph from requiring students and families to agree with Catholic teaching in word and deed. *See* R. 40, Page ID # 702-703.

## IV. The district court's decision

St. Joseph filed this pre-enforcement lawsuit to protect its First Amendment rights as a church, religious employer, and religious school. *See* SAC, R. 40. Michigan responded by moving to dismiss only for lack of standing. *See* Motion to Dismiss SAC, R. 43. The district court granted Michigan's motion to dismiss, holding that St. Joseph lacked pre-enforcement standing. R. 58, Page ID # 1165, 1181.

The district court agreed that "St. Joseph may fall within the purview of the ELCRA as an employer, an educational institution, and potentially a place of public accommodation." R. 58, Page ID # 1170 (cleaned up). It also "agree[d] with Defendants that it would be 'impossible' for [them] to disavow application of the ELCRA to St. Joseph." R. 58, Page ID # 1181

19

(quoting Defendants' Brief in Support of Motion to Dismiss, R. 44, Page ID # 845). Nevertheless, the district court held that "[t]he issue in this case is whether, in applying [the new ELCRA], Defendants have refused to concomitantly consider constitutional and statutory religious exemptions such that St. Joseph faces a credible threat of [enforcement]." R. 58, Page ID # 1180. To the district court, St. Joseph lacked such a threat. That's because the district court held that the new ELCRA could, in the future, be construed "to recognize[] religious freedoms like those asserted by St. Joseph herein," *see* R. 58, Page ID # 1181, and "[a]dditionally, the ELCRA expressly provides a form of redress for St. Joseph's concerns about its hiring practices that St. Joseph has not utilized," R. 58, Page ID # 1173—the very BFOQ process that St. Joseph challenged. As to ripeness, the district court acknowledged that ripeness "shares a foundation" with Article III standing and concluded that, for these same reasons, its ripeness "analysis would likely lead to the same result." R. 58, Page ID # 1166 n.2.

## SUMMARY OF ARGUMENT

The district court's decision to deny St. Joseph pre-enforcement standing, and correspondingly hold its First Amendment claims unripe, must be reversed. This is so for three reasons.

*First*, the decision conflicts with what it means to be "arguably" proscribed under *SBA List*. Under that case, a plaintiff's conduct is "arguably" proscribed by a statute when its conduct is covered by a law

20

that "sweeps broadly and covers the subject matter of [a plaintiff's] intended speech" or religious exercise. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (citation omitted). When that happens, a plaintiff's conduct "implicates" the law, and that's enough for pre-enforcement standing. *Platt v. Bd. of Comm'rs on Grievances and Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014).

Here, the district court rejected that standard and turned the "arguably" proscribed inquiry into an "actually" proscribed inquiry. It agreed that St. Joseph "may fall within the purview of the ELCRA" when it exercises religion as an employer, a school, and potentially as a public accommodation. But because, in the district court's view, ELCRA could be "construed" to recognize St. Joseph's religious exercise, speech, and assembly, St. Joseph lacked standing and possessed unripe claims. If the district court is right, then every pre-enforcement claim that a district court believes is of questionable merit should be dismissed for lack of standing. This is the same kind of error that led the Supreme Court to reverse this Court in *SBA List*. *See* 573 U.S. at 163 ("The Sixth Circuit misses the point" to find that SBA List's conduct is not arguably proscribed because SBA List did not intend to make knowingly false statements in violation of the statute). Moreover, this error is compounded by the district court's various efforts to "construe[]" ELCRA consistently with the First Amendment. St. Joseph's conduct is "arguably" proscribed, and it was reversible error to conclude otherwise.

*Second*, the district court's decision misunderstands what constitutes a "credible threat of enforcement." Circuits nationwide agree that a credible threat can be presumed when a state enacts a new law and refuses to disavow enforcement of that law against the plaintiff. That's this case. The new ELCRA was enacted in March 2023. And Michigan told St. Joseph that the new ELCRA's "broad" reach—plus the "fact-specific" nature of any religious freedom protection Michigan might one day recognize—meant it was "impossible" for Michigan to disavow enforcement. That should have been sufficient.

Yet here, due to a confused reading of this Court's decision in *McKay*, the district court treated Michigan's refusal to disavow enforcement as an afterthought. No enforcement presumption was acknowledged, and the district court even suggested a circuit split existed between this Circuit and most others. A proper application of the enforcement presumption makes it unnecessary to consider *McKay*. Yet even if *McKay* is used, there is a credible threat and concluding otherwise is reversible error.

*Third*, the district court's *SBA List* errors underscore a First Amendment problem. As a church, St. Joseph is protected from "not only the conclusions that may be reached by the [Civil Rights Commission] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). Yet telling

St. Joseph that it cannot sue Michigan until after it is investigated or sued—and conditioning its religious exercise as to every employee on obtaining a BFOQ—forces St. Joseph to endure a process that is itself a punishment. This Court should reverse before St. Joseph's free exercise, speech, and assembly rights are downgraded from constitutional guarantees to regulatory gratuities.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal under Rule 12(b)(1) for lack of standing. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022). In doing so, this Court "take[s] as true the well-pleaded allegations in the complaint and ask[s] whether plaintiff[] plausibly alleged [its] standing to sue." *Id.*

## ARGUMENT

### I. Under the new ELCRA, St. Joseph has standing and its claims are ripe.

"[I]n a pre-enforcement review case under the First Amendment (like this one)," there is no need for a "concrete and particularized" injury—only a "sufficiently imminent" one. *Platt*, 769 F.3d at 451. Indeed, Article III does not require St. Joseph to wait and experience "an actual arrest, prosecution, or other enforcement action." *SBA List*, 573 U.S. at 158. Instead, under *SBA List*, St. Joseph must only allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest;" (2) that its conduct is "arguably proscribed" by the challenge

23

law; and (3) that "there exists a credible threat of prosecution thereunder." *Id.* at 159-64; *see also Platt*, 769 F.3d at 451. St. Joseph meets that standard, and the district court therefore erred in dismissing this case.

The same follows for ripeness, as "[t]he doctrines of standing and ripeness 'originate' from the same Article III limitation," and "[t]he line between [them] in pre-enforcement First Amendment challenges has evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (quoting *SBA List*, 573 U.S. at 157 n.5, 165-66). That's because "a reasonable threat of prosecution creates a ripe controversy," and is a "harm sufficient to justify pre-enforcement review." *SBA List*, 573 U.S. at 165. Accordingly, "standing and ripeness … are analyzed together in challenges of this sort," and "come to the same question: Have [plaintiffs] established a credible threat of enforcement?" *Winter*, 834 F.3d at 687. As in *Winter*, "[t]he answer," here, "is yes." *Id.* Reversal is warranted.

## A. St. Joseph's conduct is arguably affected with a constitutional interest.

St. Joseph satisfies the first *SBA List* step because St. Joseph's conduct is "affected with a constitutional interest," 573 U.S. at 159. Michigan does not dispute this.

St. Joseph engages in religiously protected conduct as an employer, an educational institution, and as a provider of services available to the public. As a religious employer, St. Joseph enjoys a "right to shape its

24

own faith and mission through its appointments." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). This right of ministerial selection is one "component" of St. Joseph's broader "autonomy with respect to internal management decisions that are essential to the institution's central mission," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Further, St. Joseph's parish school provides Catholic education, which is "vital" to handing on the faith and thus, for St. Joseph, possesses a "close connection" with its "central purpose." *Id.* at 2064, 2066; *see also Carson v. Makin*, 596 U.S. 767, 787 (2022) (religious education "lie[s] at the very core of the mission of a private religious school"). And of course, St. Joseph is a Catholic parish providing "religious services"—conduct "at the very heart of the First Amendment's guarantee of religious liberty." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020).

These activities are detailed in St. Joseph's second amended complaint. *See* R. 40, Page ID # 694-697 (hiring teachers, school and parish staff, and recruiting volunteers), 663 (catechetical instruction), 665, 699-703 (ensuring Catholic identity with "shared time" teachers, RESA staff, sacramental preparation, and school activities). Indeed, Michigan conceded that the first *SBA List* step is "arguably satisfie[d]," R. 44, Page ID # 837, and the district court did not conclude otherwise. The first *SBA List* step is thus met.

25

**B. The new ELCRA arguably proscribes St. Joseph's conduct.**

St. Joseph also satisfies the second *SBA List* step. That step asks whether St. Joseph's conduct is "'*arguably* proscribed' by the [statute]." 573 U.S. at 162 (emphasis added).

Importantly, this step does not require St. Joseph to prove that its "intended conduct is *in fact* proscribed." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022). That distinction is crucial. Without it, courts would "conflate the merits of the plaintiff's … claim with her standing to bring it." *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 390 (6th Cir. 2022) (cleaned up); *see also Brown v. Kemp*, No. 21-1042, 2023 WL 7489920, at *9 (7th Cir. Nov. 13, 2023) (accord). "Just because a plaintiff's claim might fail on the merits does not deprive the plaintiff of standing to assert it." *Barber*, 31 F.4th at 390 (cleaned up); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) (pre-enforcement standing even though plaintiffs lost on the merits).

For pre-enforcement standing, all that matters is St. Joseph's constitutional conduct "*implicates*, if not violates, each provision of the law at issue." *Platt*, 769 F.3d at 451 (cleaned up) (emphasis added); *see also Carey v. Wolnitzek*, 614 F.3d 189, 196 (6th Cir. 2010) (accord). This standard is satisfied when a plaintiff shows that a law "arguably sweeps broadly enough to capture [the plaintiff's] conduct." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 217 (5th Cir. 2023).

Here, the district could held that "St. Joseph may fall within the purview of the ELCRA as an employer," a school, and potentially as a public accommodation. R. 58, Page ID # 1170. That is enough to satisfy the second *SBA List* step. But instead of stopping there, the district court erred by further analyzing whether ELCRA could be "construed with other laws" to avoid violating St. Joseph's First Amendment protections. R. 58, Page ID # 1173. The district court thus conflated standing ("arguably" proscribed) with the merits ("actually" proscribed) and must be reversed.

**1. The new ELCRA arguably prohibits St. Joseph's religious exercise.**

Here, there is no dispute that—as the district court said—"St. Joseph may fall within the purview of the ELCRA as an employer, … an educational institution, … and potentially a place of public accommodation." R. 58, Page ID #1170 (cleaned up). Accordingly, St. Joseph's conduct at least "*implicates* … each provision of the law at issue." *Platt*, 769 F.3d at 451 (cleaned up) (emphasis added). For each role, that conclusion is straightforward.[1]

---

[1]    While the new ELCRA is not yet in effect, "[i]n settings like this one," that is after a law's passage but before its effective date, "the Supreme Court has permitted plaintiffs to challenge laws well before their effective date.*" Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 537 (6th Cir. 2011), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).

***Employer.*** ELCRA defines "employer" as "a person that has 1 or more employees." MCL § 37.2201(a), as amended by 2023 Mich. Pub. Acts 6. It states that employers may not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual … because of … sexual orientation [or] gender identity." MCL § 37.2202(a), as amended by 2023 Mich. Pub. Acts 6. Nor can they "print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign relating to employment by the employer … that indicates a preference, limitation, specification, or discrimination, based on … sexual orientation [or] gender identity." MCL § 37.2206(1), as amended by 2023 Mich. Pub. Acts 6. But unlike Title VII, the new ELCRA doesn't exempt religious employers from liability for sexual orientation and gender identity discrimination. *Supra* 11, 13-14.

St. Joseph employs more than one employee and is therefore subject to ELCRA. R. 40, Page ID # 693. St. Joseph requires its employees to comply with Catholic teaching on human sexuality and gender. R. 40, Page ID # 671-672. This means that St. Joseph treats employees according to biological sex, not gender identity. R. 40, Page ID # 671-672, 694-695. It also means that St. Joseph cannot hire a prospective employee who is in a same-sex relationship. R. 40, Page ID # 671-672. These activities all implicate St. Joseph's right to religious exercise, speech, and assembly. R. 40, Page ID # 707-709, 713-716. And all this conduct "implicates, if not violates," the new ELCRA. *Platt*, 769 F.3d at 451.

*The BFOQ Process*. Moreover, the redress the new ELCRA claims to provide—"BFOQs for religious exemptions related to employment where 'reasonably necessary to the normal operation of the business or enterprise,'" R. 58, Page ID # 1170 (quoting MCL § 37.2208)—arguably proscribes St. Joseph's First Amendment guarantees to church autonomy and to equal treatment.

As an initial matter, the district court agreed that the BFOQ system "provides the Department [of Civil Rights] with authority to make individualized exemptions for employers." R. 58, Page ID # 1158. But the district court's agreement only confirms that the BFOQ process is not generally applicable, and thus denying St. Joseph a BFOQ in this context would be subject to—and fail—strict scrutiny. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021) ("The creation of a system of exceptions … undermines the City's contention that its non-discrimination policies can brook no departures."); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685-88 (9th Cir. 2023) (en banc) (explaining that under *Fulton*, "the mere existence of government discretion is enough to render a policy not generally applicable.").

Further, forcing St. Joseph to enter the BFOQ process, as to every employee, arguably proscribes St. Joseph's exercise of its church autonomy. That autonomy is "a structural" protection that "categorically prohibits federal and state governments from becoming involved" in

29

certain "disputes" that affect a church's faith or religious mission. *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015). Those "disputes" include ones over, as in *Conlon*, whether an employee is a "minister" and thus can be selected or terminated by the church without government involvement. *See id.* But the "ministerial exception" is only one "component"—St. Joseph also has "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady*, 140 S. Ct. at 2060. The BFOQ process puts the application of St. Joseph's religious mission at issue as to every employee.

Here, the BFOQ process means that St. Joseph's religious hiring policies are only protected if Michigan first decides they are "reasonably necessary" to a particular job. *See* MCL § 37.2208. This is a stark departure from Title VII, which categorically prohibits certain employment lawsuits against religious entities. *See Amos*, 483 U.S. at 335-36. Under the new ELCRA, Michigan will be "[t]rolling through [St. Joseph's] beliefs" and "making determinations about its religious mission and whether certain faculty members contribute to that mission." *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 835 (D.C. Cir. 2020). That "is no business of the State." *Id.* Yet the new ELCRA requires St. Joseph to submit to this process for every employee to uphold the Catholic understanding of human sexuality, gender, and marriage—and then repeat the process at five-year increments. *Supra* 17 (describing

process). This "very process of inquiry" is prohibited by the church autonomy doctrine. *See Catholic Bishop*, 440 U.S. at 502.

***Educational Institution.*** The new ELCRA defines "educational institution" as "a public or private institution … and includes an … elementary or secondary school." MCL § 37.2401. St. Joseph runs a private religious elementary school. Although religious educational institutions are exempt from the nondiscrimination provision "related to religion," MCL § 37.2403, they aren't exempt from the recently amended nondiscrimination provisions related to sexual orientation and gender identity. This poses a new threat to St. Joseph's Catholic conduct because it arguably faces liability for (1) maintaining separate bathroom and locker room facilities for boys and girls, (2) assigning children to sports teams by biological sex, and (3) maintaining separate dress codes for boys and girls. In all these activities, St. Joseph uses a child's biological sex, not gender identity. R. 40, Page ID # 675, 702-703. The same is also true for names and pronouns. R. 40, Page ID # 675. This conduct is arguably proscribed by ELCRA.

***Public Accommodation.*** ELCRA defines public accommodation as an "institution of any kind … whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." MCL § 37.2301(a). St. Joseph's church is open to the public—along with its parish meeting rooms, sports fields, and gymnasium. R. 40, Page ID # 689. So is St. Joseph's Knights of

31

Columbus Hall. R. 40, Page ID # 690. Many of these facilities are used for public events, which means that St. Joseph is arguably a public accommodation under ELCRA. R. 40, Page ID # 689-692.

If St. Joseph is deemed a public accommodation, it would be vulnerable to myriad lawsuits. For example, the new ELCRA requires "the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of … sexual orientation [or] gender identity." MCL § 37.2102(1), as amended by 2023 Mich. Pub. Acts 6. And it's illegal for any "public accommodation" to "[d]eny an individual the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations … or public service because of … sexual orientation [or] gender identity." MCL § 37.2302(a), as amended by 2023 Mich. Pub. Acts 6. On top of that, treating St. Joseph as a public accommodation would prohibit it from "publish[ing] a statement … that indicates" its religious teachings on human sexuality in relation to its "goods, services, facilities, privileges, advantages, or accommodations." MCL § 37.2302(b), as amended by 2023 Mich. Pub. Acts 6. Also prohibited are any statements that "indicate[]" "an individual's patronage of or presence … is," among other things, "unwelcome" because of St. Joseph's religious teachings on human sexuality, gender, or marriage. *See id.*

All these layers of liability demonstrate that many aspects of St. Joseph's religious exercise, speech, and assembly now "implicate[]" the

new ELCRA. *Platt*, 769 F.3d at 451. For example, St. Joseph cannot simultaneously uphold its Catholic identity and allow biological women to use its men's bathroom. Nor can it allow biological males to play in female sporting events on its fields. R. 40, Page ID # 689-690. The pastor can't certify biological women as Godfathers or men as Godmothers. R. 40, Page ID # 692. And same-sex weddings cannot be performed or celebrated. R. 40, Page ID # 689-690. Modesty at Mass is upheld by considering a person's sex based on biology, not a subjective perception of his or her sex. R. 40, Page ID # 692. Catechetical instruction, sermons, and sacramental preparation that any member of the public hears would be spoken in accordance with the Catholic Church's teachings on human sexuality, gender, and marriage—not Michigan's. R. 40, Page ID # 691-692. Yet any of these actions would arguably deny "the full and equal utilization" of St. Joseph's facilities, goods or services, or constitute "statements" affirming now-verboten views.

### 2. The district court conflated standing with the merits.

The district court acknowledged that "St. Joseph may fall within the purview of the ELCRA" as an employer, school, and a public accommodation. R. 58, Page ID # 1170. That alone should have resolved this question. *See SBA List*, 573 U.S. at 162 ("The Ohio false statement law sweeps broadly and covers the subject matter of petitioners' intended speech.") (cleaned up); *see also Block v. Canepa*, 74 F.4th 400, 410 (6th Cir. 2023) (similar). But the district court did not stop there. The court

33

made its best guess about how it expected Michigan and subsequent courts would "construe" ELCRA, supposing that "the ELCRA does not proscribe activity otherwise protected by the First Amendment." R. 58, Page ID # 1173. The district court's conclusion conflates St. Joseph's pre-enforcement standing with the merits of its claims—turning the "arguably" proscribed standard into an "actually" proscribed standard. "If that were the test, every losing claim would be dismissed for want of standing." *Barber*, 31 F.4th at 390. This is erroneous and should be reversed.

The district court's conflation of "arguably" proscribed and "actually" proscribed rests on three errors. First, "the [ELCRA] provides that it is to be construed with other laws." R. 58, Page ID # 1173. Second, ELCRA "has been so interpreted" by Michigan courts. R. 58, Page ID # 1173. And third, "the ELCRA expressly provides a form of redress for St. Joseph's concerns about its hiring practices," the BFOQ process. R. 58, Page ID # 1173. These are all wrong.

***First***, a law's claim not to "reach constitutionally protected [activity]" does not answer whether constitutional activity is arguably proscribed. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995). Despite the law's claim, the law's "broad scope [may] present[] a 'realistic danger' [that] the [government] could compromise the protection afforded by the First Amendment." *Id.* In *Dambrot*, Central Michigan University added language to its "discriminatory harassment policy" stating that the

34

policy "will not extend … to interfere impermissibly with individuals['] rights to free speech." *Id.* This caveat, however, did "nothing to ensure [that] the University will not violate First Amendment rights even if that is not their intention." *Id.*

This Court used similar reasoning in *Doster*. There, this Court found pre-enforcement standing against a vaccine mandate—even though plaintiffs could assert defenses under the Religious Freedom Restoration Act ("RFRA") and the First Amendment. *Doster v. Kendall*, 54 F.4th 398, 417 (6th Cir. 2022). This Court held that it "conflicts with century-old law" to hold "that Plaintiffs may not raise their RFRA claims until [the Air Force] initiates termination proceedings against them for failing to take a vaccine, at which point they can invoke RFRA as a defense." *Id.* Like *Dambrot*, RFRA is incorporated into all federal law unless it is expressly disclaimed. It is, in other words, as if RFRA is written into the challenged law or policy itself. *See* 42 U.S.C. § 2000bb-3(a)-(b). Yet the incorporation of RFRA into the rule did not save the rule from pre-enforcement challenge.

Other courts, including the Supreme Court, have followed suit. For example, in *Holder*, the Supreme Court held that pre-enforcement standing existed even though, as the dissent pointed out, the statute at issue said that "[n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." *Holder*, 561 U.S.

at 59-60 (Breyer, J., dissenting); *see also id.* at 15-16 (upholding pre-enforcement standing). Both the Eighth Circuit and the Fifth Circuit held similarly in pre-enforcement challenges to HHS's transgender mandate under the Affordable Care Act. Those cases rejected the claim that pre-enforcement standing could be defeated by the government's "general commitment to follow preexisting religious freedom and conscience protections." *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1140 (D.N.D. 2021), *affirmed in part sub nom. Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 606 (8th Cir. 2022) ("Although the government maintains that it 'will comply' with RFRA, its promise is so vague that the scope of liability is both unknown by the government and unknowable to the plaintiffs") (cleaned up); *see also Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 379 (5th Cir. 2022) ("proves too much" to defeat pre-enforcement standing simply because Government's harmonizing of religious liberty and other interests "may subtly evolve over time"). The same is true here.

Despite ELCRA's references to "other applicable laws," *e.g.*, R. 58, Page ID # 1170, St. Joseph's conduct is still *arguably* proscribed. For example, ELCRA's construction provision guarantees that no construction should "prevent[] the commission from securing civil rights" in "other" laws. MCL § 37.2705(1). But this provision does nothing more than clarify that Michigan's Civil Rights Commission *may* secure civil rights beyond those enumerated in ELCRA. *See* 5 Mich. Civ. Jur. Civil

Rights § 21. It is still a choice, not a command, to consider the First Amendment—and the Commission may decline to do so, as it has before, even if that means substantially burdening religious exercise.[2]

Similarly, ELCRA's public accommodations provision prohibits discrimination "[e]xcept where permitted by law." MCL § 37.2302 (limit on public accommodations provisions). But what constitutes "law" is left up to the Commission on a case-by-case basis. The district court suggested that "law" includes federal religious liberty protections, *see* R.58, Page ID # 1170-1173, but that need not be so. Indeed, the Michigan Supreme Court has refused to determine whether "law" in ELCRA even refers to the federal Constitution. *See Dep't of C.R. ex rel. Forton v. Waterford Twp. Dep't of Parks & Recreation*, 387 N.W.2d 821, 828 (Mich. 1986) ("it is not necessary … to determine whether 'permitted by law' has reference to constitutional and common law as well as statutory law."). And even if "law" was construed in the way the district court suggested here, that would still only prevent St. Joseph from being liable as a public

---

[2] *Compare Declaratory Ruling on Contraceptive Equity*, Michigan Civil Rights Commission, 7 (Aug. 21, 2006), https://t.ly/c1w1a (refusing, with no First Amendment analysis, ELCRA religious exemption for contraceptive coverage to those "owned or operated by a religious organization … if they provide services to the general public") *with Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 709 (2014) (holding that neither the Free Exercise Clause nor federal statute permit limiting religious exemption to contraceptive mandate based on "corporate form").

accommodation. No part of this section protects St. Joseph as an employer or as a school.

Here then, the question and answer are thus the same as in *Dambrot*: whether it is "clear from the text of the [law]" that St. Joseph's religious exercise, speech, and assembly "can [all] be prohibited upon the initiative of [Michigan]." *See* 55 F.3d at 1183. That answer is "yes," which is enough for "arguably" proscribed.

The district court distinguished *Dambrot* because it is "an overbreadth challenge." R. 58, Page ID # 1171. That is irrelevant here. Even overbreadth plaintiffs "may bring suit only when they [at least] face an imminent threat that they will suffer an injury." *Birmingham v. Nessel*, No. 21-1297, 2021 WL 5712150, at *3 (6th Cir. Dec. 2, 2021); *see also NRA v. Magaw*, 132 F.3d 272, 285 (6th Cir. 1997) (relying on *Dambrot* when explaining First Amendment pre-enforcement standing). The only difference is that overbreadth challengers may rely on an imminent threat to *others*. *See Friends of Georges v. Mulroy*, No. 2:23-cv-2163, 2023 WL 3790583, at *9 (W.D. Tenn. June 2, 2023) ("upshot" of overbreadth distinction is ability "to challenge an entire statute's constitutionality based on [law's] 'application to other individuals not before the court'") (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009)). Aside from that difference, the same standing requirements (including "arguably" proscribed) apply. Thus, *Dambrot* cannot be dismissed so easily.

38

The district court was also wrong to evade *Dambrot* by relying upon the presumption of constitutionality. R. 58, Page ID # 1171. That's the wrong question at this stage. Whether a law "arguably" proscribes conduct asks only whether St. Joseph *has* "at least a plausible interpretation of the statute." *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022). By contrast, the presumption of constitutionality "is a tool for choosing *between* competing plausible interpretations of a statutory text." *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (emphasis added); *People v. Skinner*, 917 N.W.2d 292, 302 (Mich. 2018) (acts as tiebreaker between "reasonable" interpretations). It is, therefore, not a standing question.

Here, St. Joseph has a "at least a plausible" interpretation of the new ELCRA. *See Yellen*, 54 F.4th at 337. St. Joseph's interpretation does not need to be the only plausible interpretation for its conduct to be "arguably" proscribed—it just needs to be "reasonable enough," *Picard*, 42 F.4th at 98. It is.

**Second**, the district court also erred because how ELCRA "has been … interpreted," R. 58, Page ID # 1173, only reinforces that St. Joseph's conduct is "arguably" proscribed. Out of the five cases cited by the district court, only one—a federal court case (*Ciurleo v. St. Regis Parish*, 214 F. Supp. 3d 647 (E.D. Mich. 2016))—correctly articulates one of St. Joseph's religious liberty protections (the ministerial exception). But the remaining four cases—"Michigan cases interpreting Michigan law," R. 58, Page ID # 1178—demonstrate how St. Joseph's conduct is

arguably proscribed under the new ELCRA, and why St. Joseph needs pre-enforcement relief from a *federal* court.

Indeed, the first Michigan case cited by the district court was a loss for the religious claimant—because the Christian school did not go through the same BFOQ process that, here, violates St. Joseph's religious freedom. *See* R. 58, Page ID # 1172 (discussing *McLeod v. Providence Christian Sch.*, 408 N.W.2d 146, 151 (Mich. Ct. App. 1987)). The second, *Porth v. Roman Catholic Diocese* (R. 58, Page ID # 1173), applied RFRA to ELCRA. *See* R. 58, Page ID # 1173 (discussing *Porth v. Roman Catholic Diocese*, 532 N.W.2d 195, 200 (Mich. Ct. App. 1995)). But RFRA no longer applies against the states, *see City of Boerne v. Flores*, 521 U.S. 507, 536 (1997), and "[c]onsequently, much of the reasoning of the *Porth* panel is no longer applicable," *Weishuhn v. Catholic Diocese of Lansing*, 756 N.W.2d 483, 497 (Mich. Ct. App. 2008).

While the latter two, *Weishuhn* and *Assemany*, R. 58, Page ID # 1173, acknowledge the First Amendment's ministerial exception, they are at odds with the U.S. Supreme Court. *Weishuhn* endorses *McLeod*'s priority given to the BFOQ process. *See Weishuhn*, 756 N.W.2d at 494 ("Significant[]"). And it conditions ministerial status on factors that resemble those rejected by the Supreme Court in *Hosanna-Tabor* and *Our Lady*. *Compare Weishuhn*, 756 N.W.2d at 500 (courts must analyze "primarily religious duties and responsibilities," "religious significance" to duties, whether "position was inherently, primarily, or exclusively

religious," and whether "functions were essentially liturgical"), *with Hosanna-Tabor,* 565 U.S. at 192-94 (rejecting primary duties test), *and Our Lady*, 140 S. Ct. at 2066-67 (refusing to analyze ministerial status "as checklist items to be assessed and weighed against each other in every case"). For its part, *Assemany v. Archdiocese of Detroit*, 434 N.W.2d 233 (Mich. Ct. App. 1998), limits ministerial selection to instances where "governmental interests" do not "overbalance" free exercise," *id.* at 237. But *Hosanna-Tabor* concluded that "the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way." 565 U.S. at 196.

In short, the "Michigan cases interpreting Michigan law" identified by the district court, R. 58, Page ID # 1178, confirm what the plain text of the new ELCRA already showed: St. Joseph's "free exercise of religion," "speech," and assembly, are now, in violation of the First Amendment, conditioned on first "demonstrating to government officers some special need." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022). This means St. Joseph's conduct is arguably proscribed.

***Third and finally***, the district court "misses the point" by claiming that St. Joseph can avoid violating the new ELCRA by using the BFOQ process. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); *see also* R. 58, Page ID # 1173 ("the ELCRA expressly provides a form of redress for St. Joseph's concerns about its hiring practices that St. Joseph has not utilized"). "Demanding that [St. Joseph] comply with the

Government's 'alternative'"—*i.e.*, the BFOQ process—"would therefore require [St. Joseph] to forgo the exercise of a First Amendment right we must assume it has," "subject[ing] itself to the very framework it says unconstitutionally burdens" its free exercise, speech, and assembly. *See Cruz*, 596 U.S. at 298.

There's no way St. Joseph could be forced into the BFOQ process—as to every single parish and school employee—without violating its "structural" protection against "federal and state governments from becoming involved" in who the church selects to carry out its religious mission. *See Conlon*, 777 F.3d at 836. And even when First Amendment "ministers"—like the pastor, catechetical instructors, school principal, and teachers—are not at issue, other employees, volunteers, "shared time," and RESA staff are all expected to uphold the Catholic understanding of sexuality, gender, and marriage on campus. *See* R. 40, Page ID # 663, 665, 694-697, 699-703. Some are not even eligible for the BFOQ process, but they could nevertheless sue St. Joseph under the new ELCRA. And if St. Joseph does not use the BFOQ process, it "shall have the burden" of meeting the same "reasonably necessary" standard in the ensuing lawsuit, as if it went through the BFOQ process. *See* MCL § 37.2208. Such inquiries—either in the BFOQ process or in an ELCRA lawsuit—would "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Catholic Bishop*, 440 U.S. at 502; *see also, e.g.*,

42

*id.* at 502 n.10, 507 ("how many liturgies are required at Catholic parochial high schools; do you know?"). Thus, the "very process of inquiry" into such disputes, much less "the conclusions that may be reached," "may impinge on rights guaranteed by the Religion Clauses." *Id.* at 502. Forcing St. Joseph to subject—at five-year increments—all its employment relationships to the government's view of what's "reasonably necessary," "finds no support in [the Supreme Court's] standing jurisprudence." *Cruz*, 596 U.S. at 298.

*  *  *

All St. Joseph must show to meet the "arguably" proscribed standard is that its conduct "*implicates*, if not violates, each provision of the law at issue." *Platt*, 769 F.3d at 451 (cleaned up & emphasis added). It did. And the district court's contrary conclusion required it to conflate standing with the merits. That is reversible error. St. Joseph satisfies the second *SBA List* step.

## C. St. Joseph faces a credible threat of enforcement.

St. Joseph also satisfies the third *SBA List* step—a credible threat of enforcement. This last element "is not supposed to be a difficult bar," *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022), and it is set "extremely low," *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003). Here, St. Joseph clears this low hurdle for two independent reasons. First, because the challenged provisions of ELCRA were recently added, courts presume

that the government will enforce its newly amended law. And second, if they even apply in this context, St. Joseph meets the *McKay* factors.

### 1. Given Michigan's refusal to disavow enforcement, enforcement is presumed.

"[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes … courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Barilla v. City of Houston*, 13 F.4th 427, 432 (5th Cir. 2021). This enforcement presumption comes from the Supreme Court. *See Virginia v. Am. Booksellers Assoc., Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."). Nearly every circuit invokes it.[3]

Here, however, the district court erroneously suggested that a circuit split exists between this Court and nearly every other circuit. The district court said that "[t]he multi-factor analysis set forth in the Sixth Circuit's

---

[3] *See, e.g.*, *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996); *Vitagliano v. County of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023); *Planned Parenthood of Central N.J. v. Farmer*, 220 F.3d 127, 148 (3d Cir. 2000); *Bryant v. Woodall*, 1 F.4th 280, 286-87 (4th Cir. 2021); *Barilla*, 13 F.4th at 432 (5th Cir. 2021); *Hays v. City of Urbana*, 104 F.3d 102, 103-04 (7th Cir. 1997); *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006); *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006-07 (9th Cir. 2003); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1173 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023); *Harrell v. Florida Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010).

decision in *McKay*, not decisions from the Second or Fifth Circuits [that recognize such a presumption], binds this Court." *See* R. 58, Page ID # 1176 n.4. But this Circuit has not created—and need not create now—a circuit split. *McKay*'s multi-factor test doesn't apply to cases like this one, where the defendants have both the power to enforce the law and the power to disavow enforcement.

*McKay* was a case where the defendants "ha[d] no independent authority to enforce the challenged order," and it was therefore "[m]ore important[]" to show a "history of past enforcement." *McKay v. Federspiel*, 823 F.3d 862, 870 (6th Cir. 2016). But here, the ink is still drying on the new ELCRA—so "it makes sense that there would be at best limited evidence of a history of enforcement." *See Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (lack of enforcement history was of "little weight" in that context). Nor is there any dispute that Defendants can, and do, enforce ELCRA.

In this case, St. Joseph is challenging a new statutory amendment that Michigan admits is "broad," and the only "religious freedom" Michigan would recognize is "so fact dependent" that "[i]t is impossible for Defendants to disavow application … to St. Joseph." R. 44, Page ID # 845; *see also* R. 58, Page ID # 1181 (district court "agrees"). Michigan has therefore admitted that the threat to St. Joseph is credible. By using the enforcement presumption approach here, the Circuit's pre-enforcement doctrine would track the facts.

Because the district court leaned on *McKay*—where enforcement, not disavowal, was impossible—the district court treated disavowal as an afterthought. *See* R. 58, Page ID # 1181. ("To the extent that the fourth 'disavowing' question from *McKay* is relevant, … "). The district court's myopic use of *McKay* is erroneous and should be reversed. *See Online Merchs. Guild*, 995 F.3d at 551 ("this court has held there to be standing for a pre-enforcement challenge without any warning letter or similar specific correspondence whatsoever" (citing *Platt*, 751 F.3d at 452)); *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (*McKay* factors aren't "a laundry list" and plaintiffs "don't have to satisfy all" of them).

Nor must this Circuit break new ground, as it has already embraced the logic behind the enforcement presumption, explaining that it is "inconceivable that the government would enact a widely publicized law … and then sit idly by" as it is violated. *NRA*, 132 F.3d at 289; *see also Nabors*, 35 F.4th at 1034-35 (finding pre-enforcement standing because when "2019 amendments explicitly ban" plaintiffs' conduct, there is "[n]o explanation" for the law other than "to target plaintiffs," and the "district attorney general" has an "obligation" to enforce the law). That logic should apply here.

Here, Michigan has confirmed the scenario mentioned in *NRA*, that disavowing enforcement would be "inconceivable"—or in Michigan's word, "impossible," R. 44, Page ID # 845. That is by design. ELCRA is intentionally "broad," as Defendants say. R. 44, Page ID # 845. And

Defendants lobbied for passing the new ELCRA without any religious exemptions. As the Michigan Civil Rights Commission said, the changes must be enacted "without any amendments that would seek to reduce their scope or impact." *See* R. 40, Page ID # 685. The goal, as General Nessel said, is simple: to "enshrine" their religious-liberty-free ELCRA expansion in *Rouch World* and have it "withstand future legal attacks." R. 40, Page ID # 661. Because those who violate ELCRA's new understanding of discrimination in the name of their religion are "not religious heroes, they are bigots." R. 40, Page ID # 682 (cleaned up).

Similar views prevailed in the Michigan Legislature. For example, the lead Senate sponsor explained that government shouldn't "let religion discriminate against someone because of their sexual orientation or gender identity." R. 40, Page ID # 685-686. Another Senator said religious accommodations "represent[] a license to discriminate" and are "fundamentally wrong." R. 40, Page ID # 686. Other senators agreed, insisting that religious accommodations should be refused because "[d]iscrimination is never okay." R. 40, Page ID # 686. Enforcement can therefore be presumed.

And in truth, this Court does not need to presume anything—because Michigan and private parties *are* enforcing this new understanding of discrimination against religious entities, be it under the new ELCRA or the Commission's interpretation of the old one. *Supra* 14-15 (discussing investigations against Catholic Charities of Shiawassee and Genesee

47

Counties, Emmaus Health, and lawsuit against Calvin University). Given these ongoing investigations and lawsuit—all triggered by private complaints—Michigan cannot seriously contend that it has no intention of enforcing the new ELCRA against religious institutions like St. Joseph, even if it hadn't admitted that disavowal is impossible. *See SBA List*, 573 U.S. at 164 ("The credibility of that threat is bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency.").

Securing a "clarification" of St. Joseph's First Amendment rights— "before stifling their constitutional practices or otherwise exposing [itself] to punishment or enforcement action"—is "a core purpose of a declaratory judgment." *Braidwood Management, Inc. v. EEOC*, 70 F.4th 914, 927-28 (5th Cir. 2023). It is also a core First Amendment guarantee. Prohibiting state entanglement with "the religious mission of [St. Joseph]" does not happen by counting on "[g]ood intentions by government—or third parties." *Catholic Bishop*, 440 U.S. at 502. This is why Title VII exempted religious organizations from many employment discrimination claims, rather than condition their protection on case-by-case bureaucratic solicitude. *See Amos*, 483 U.S. at 336 ("Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission."). The district court's decision, by contrast, requires St. Joseph to let Michigan first determine "a formal policy or interpretive statement" about St. Joseph's First Amendment rights before receiving

48

declarative relief. *See* R. 58, Page ID # 1161. Considering how favorable *Rouch World* was to Michigan's accommodation-free ELCRA—and how successfully Defendants lobbied the Michigan Legislature to enact an accommodation-free ELCRA expansion—this is "coy at best and tenuous." *Braidwood*, 70 F.4th at 927-28 (rejecting similar argument from EEOC after *Bostock*). A credible threat can be presumed, and "denying prompt judicial review" is, therefore, a "substantial hardship." *SBA List*, 573 U.S. at 167-68. The district court should be reversed.

## 2. Even if the *McKay* factors apply, St. Joseph meets them.

Under *McKay*, there is "a credible threat of prosecution where plaintiffs allege a subjective chill *and* point to some combination of the following factors": (1) "a history of past enforcement"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) "a defendant's refusal to disavow enforcement." 823 F.3d at 869. The district court did not dispute that St. Joseph's religious exercise is chilled, *see* R. 58, Page ID # 1173, but was wrong to conclude that the *McKay* factors don't support St. Joseph.

***Disavowal.*** Here, Michigan refuses to disavow enforcement against St. Joseph, claiming that "[i]t is impossible for Defendants to disavow application of a statute as broad as the ELCRA to St. Joseph," because "the religious freedom inquiry would be so fact dependent." R. 44, Page

49

ID # 845. The district court "agree[d]" and held this counted against St. Joseph. *See* R. 58, Page ID # 1181 (citations omitted). That turns the *SBA List* rule on its head.

Michigan's refusal to disavow *strengthens* St. Joseph's claim for standing. Multiple circuits consider a failure to disavow important evidence of a credible threat. *Cal. Trucking Assoc. v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) ("state's refusal to disavow enforcement" "is strong evidence that the state intends to enforce the law"); *Peck*, 43 F.4th at 1133 ("state's staunch refusal to disavow prosecution has heavy weight"). That's especially true here given Michigan's "interest in regulating [this subject matter] remains vividly apparent." *Bryant*, 1 F.4th at 288. As General Nessel said, the new ELCRA's purpose is to "solidify[]" *Rouch World*, so that its conclusions "cannot be easily overturned by a future court." R. 40, Page ID # 686-687. Thus, the Court "cannot dismiss the threat of prosecution as 'not remotely possible.'" *Bryant*, 1 F.4th at 288 (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 299 (1979)).

What's more, if this Court credits Michigan's impossible-to-disavow position, states could routinely dodge pre-enforcement challenges with similar tactics. The result would be the exact choice forbidden by the Supreme Court's pre-enforcement standing inquiry: (1) expose themselves to "arrest, prosecution, or other enforcement action[s]," or (2) forgo their constitutionally protected conduct. *SBA List*, 573 U.S. at 158;

*Babbitt*, 442 U.S. at 298; *cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This Court shouldn't let Michigan escape review with an enforcement position "so vague that the scope of liability [is] both 'unknown by [itself] and unknowable to those regulated by it.'" *Franciscan Alliance*, 47 F.4th at 377; *see also Sisters of Mercy*, 55 F.4th at 606. Yet the district court's decision permits that exact result—requiring St. Joseph to await "a formal policy or interpretive statement" from the Michigan Civil Rights Commission. R. 58, Page ID # 1161.

Michigan's claim that disavowal is impossible only confirms that St. Joseph's fear of enforcement is well-founded. That's because, in effect, Michigan has conceded that at least *some* circumstances exist in which ELCRA would apply to St. Joseph. *See Franciscan Alliance*, 47 F.4th at 376 (the government "concede[d] that it may" enforce the statute against plaintiff when it refused to take a position); *Braidwood*, 70 F.4th at 927 (similar). If the new ELCRA had no facial application to St. Joseph, disavowal would be easy. But, as the district court said, St. Joseph "may fall within the purview" of the new ELCRA, R. 58, Page ID # 1170, and Michigan won't disavow enforcement. R. 58, Page ID # 1181. This factor supports standing.

**_Enforcement History._** Michigan has an extensive history of enforcing ELCRA. For example, in the last three years alone, Michigan has closed

nearly 4,000 discrimination complaints under ELCRA. MCRC Annual Report 30 (2022), https://perma.cc/XXD7-KFBE; MCRC Annual Report 66 (2020-21), https://perma.cc/CP6V-5FGK. In addition, the Commission's 2018 interpretive statement—which redefined "sex" to include sexual orientation and gender identity—created a massive spike in sex discrimination claims, which has only increased with each passing year. R. 40, Page ID # 677. Indeed, this past year produced over 900 sex discrimination claims, a 202% increase and the highest number on record. R. 40, Page ID # 678. And as General Nessel explained, the new ELCRA is meant to help the successful decision to prosecute religious businesses in *Rouch World* "withstand future legal attacks." R. 40, Page ID # 685.

The district court found this extensive history unimportant, however. In its view, this factor weighed against standing because St. Joseph couldn't identify a history of enforcement against "St. Joseph or another religious school." R. 58, Page ID # 1177.

That misses the mark. When it comes to demonstrating enforcement history, St. Joseph must only show that Michigan "*does prosecute*" violations of ELCRA generally. *Block*, 74 F.4th at 410 (reversing district court's "flawed" standing analysis for requiring specific enforcement history); *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019) (similar). That makes sense for several reasons.

52

First, when St. Joseph's conduct is arguably proscribed by a statute that Michigan routinely enforces, its fear of prosecution can't be shrugged off as "imaginary or wholly speculative." *SBA List*, 573 U.S. at 160. Second, a lack of specific enforcement against St. Joseph's conduct "could just as well indicate that [similar conduct] has already been chilled" through Michigan's general enforcement of ELCRA. *Speech First*, 939 F.3d at 766; *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1773-74 (9th Cir. 2018) (explaining that lack of enforcement history may often result from compliance with the law, meaning "there [are] few, if any, violations to punish"). And third, that Michigan hasn't yet enforced ELCRA against St. Joseph's specific conduct "might [also] be simply a coincidence." *Block*, 74 F.4th at 410. For all these reasons, this Court has never required an enforcement history against specific conduct, and Michigan's extensive history of enforcing ELCRA is enough.

***Public Enforcement.*** A threat of enforcement is credible when "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *McKay*, 823 F.3d at 869. Here, ELCRA allows any "person alleging a violation of this act [to] bring a civil action" for damages and injunctive relief. MCL § 37.2801. As a result, this provision "increases the likelihood that [St. Joseph] will have to defend against" lawsuits under the statute. *Online Merchs. Guild*, 995 F.3d at 551.

The district court disagreed. Even though ELCRA allows anyone to sue, it determined that St. Joseph's fears were unfounded because none of these potential suits can "be premised on discrimination that is 'permitted by law.'" R. 58, Page ID # 1180 (citing MCL § 37.2302(a)). This provision just gives Michigan more discretion. *Supra* 37-38. Regardless, it doesn't matter whether St. Joseph would prevail in every meritless private suit. *See Online Merchs. Guild*, 995 F.3d at 551 ("although [the statute] employs various safe harbors that preclude liability" "this does not preclude enforcement actions and the associated costs that [Plaintiff] would incur"). When it comes to private suits, the Supreme Court doesn't require a credible threat of *successful* enforcement. That's because "the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations," and "there is a real risk of complaints from" those who may dislike St. Joseph's sincerely held religious beliefs. *SBA List*, 573 U.S. at 164; *see also id.* (Plaintiffs' intended conduct made them "easy targets" for meritless suits). Thus, this factor also supports standing.

\* \* \*

St. Joseph alleged everything it needs to establish pre-enforcement standing under *SBA List*. No one disputes that St. Joseph engages in constitutionally protected conduct (step 1). St. Joseph's conduct is, in multiple ways, arguably proscribed by the new ELCRA (step 2). And St. Joseph has alleged a credible threat of enforcement (step 3). Only a

distorted take on *McKay* led the district court astray. This result was not required by this Court's precedent. *See Platt,* 769 F.3d at 451-52 (upholding a credible threat of enforcement because of potential private enforcement and refusal to disavow enforcement). And this result splits with the consensus of the other circuits. Accordingly, the district court should be reversed, and St. Joseph's suit be allowed to proceed.

## II. Declaratory and injunctive relief are appropriate remedies.

St. Joseph sought both preliminary and permanent injunctions prohibiting Michigan from enforcing ELCRA in a way that would require St. Joseph to hire employees, admit students, or "administer its parish or school in any manner" that violates St. Joseph's First Amendment rights. R. 40, Page ID # 717. St. Joseph also asked the court to declare that the First and Fourteenth Amendments protect "St. Joseph's ability to maintain religious policies and codes of conduct for employees of any kind, students, and families" and "St. Joseph's freedom to participate equally in public benefit programs." R. 40, Page ID # 716-717. Because St. Joseph has pre-enforcement standing, this Court should make clear that both declaratory and injunctive relief are appropriate remedies for Michigan's First Amendment violation.

**Injunctive Relief.** When a government actor violates the First Amendment, injunctive relief is proper. Indeed, "[u]nder well-settled law, a party is *entitled* to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable

55

injury' for which there is no adequate remedy at law." *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 616 (6th Cir. 2006) (emphasis added) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)). What's more, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fox v. Saginaw County*, 35 F.4th 1042, 1047 (6th Cir. 2022) (quoting *Elrod*, 427 U.S. at 373)). Accordingly, "[o]nce the court has determined that a First Amendment violation has occurred, the [injunction] factors weigh heavily in favor of issuing an injunction." *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 838 (E.D. Mich. 2021). Injunctive relief is warranted.

**Declaratory Relief.** "A declaratory judgment can … be used as a predicate to further relief, including an injunction." *Powell v. McCormack*, 395 U.S. 486, 499 (1969). A declaration that protects St. Joseph's First Amendment guarantees from application of the new ELCRA would also set forth St. Joseph's rights as to any plaintiff—either Michigan or a private party. By contrast, an injunction would only have the effect of stopping an unconstitutional government investigation or Michigan prosecution. The declaratory relief would ensure that St. Joseph could swiftly seek an injunction to enforce the declaration if a private party nevertheless forces it into an unconstitutional process under the new ELCRA. Declaratory relief is warranted.

## CONCLUSION

The district court should be reversed, and St. Joseph should receive declaratory and injunctive relief before its religious freedom is violated.

Respectfully submitted,

Dated: November 29, 2023

/s/ *William J. Haun*
William J. Haun
Lori H. Windham
Nicholas R. Reaves
Richard C. Osborne*
THE BECKET FUND FOR
　RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
　Suite 400
Washington, DC 20006
(202) 955-0095
*whaun@becketlaw.org*

* Not admitted to the D.C. Bar; admitted only in New Jersey. Supervised by licensed D.C. Bar members.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limit in Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,982 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: November 29, 2023                 */s/ William J. Haun*
                                          William J. Haun

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on November 29, 2023.

I certify that all participants in the case have been served a copy of the foregoing by the appellate CM/ECF system or by other electronic means.

Dated: November 29, 2023                    /s/ *William J. Haun*
                                            William J. Haun

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

### W.D. Mich. Case No. 22-1154

| Record | Description | Page ID Range |
|---|---|---|
| 40 | Second Amended Complaint | 658-718 |
| 40-1 | Exhibit A to Second Amended Complaint: *St. Joseph's Hiring Advertisement* | 719-720 |
| 40-2 | Exhibit B to Second Amended Complaint: *Catholic Diocese of Lansing Code of Conduct* | 721-722 |
| 40-3 | Exhibit C to Second Amended Complaint: *Diocese of Lansing Hiring Guidelines* | 723-742 |
| 40-4 | Exhibit D to Second Amended Complaint: *St. Joseph Family – School Agreement* | 743-747 |
| 40-5 | Exhibit E to Second Amended Complaint: *Michigan C.R. Comm'n New Regulations* | 748-757 |
| 40-6 | Exhibit F to Second Amended Complaint: *Resolution in Support of Amending ELCRA* | 758-761 |
| 40-7 | Exhibit G to Second Amended Complaint: *Policy on the Human Body* | 762-764 |
| 40-8 | Exhibit H to Second Amended Complaint: *Policy on Human Person and Gender Dysphoria* | 765-797 |
| 43 | Defendant's Motion to Dismiss Second Amended Complaint | 803-805 |
| 44 | Defendant's Brief in Support of Motion to Dismiss | 806-851 |
| 44-2 | Exhibit A to Motion to Dismiss: *Michigan Civil Rights Commission's Re-interpretation of "discrimination because of … sex"* | 853-856 |
| 44-3 | Exhibit B to Motion to Dismiss: Rouch World *Claims Court Decision* | 857-864 |

| 44-4 | Exhibit C to Motion to Dismiss: Rouch World *Stipulated Order of Dismissal* | 865-67 |
|---|---|---|
| 47 | Plaintiff's Brief in Opposition to Motion to Dismiss | 872-936 |
| 48 | Defendant's Reply Brief in Support of Motion to Dismiss | 946-966 |
| 50 | Motion to File Notice of Supplemental Authority re *Vitagliano v. County of Westchester* and *Braidwood Mgmt., Inc. v. EEOC.* | 969-975 |
| 50-1 | Exhibit A to Motion to File Notice of Supplement Authority: *Notice of Supplemental Authority* | 976-983 |
| 50-2 | Exhibit B to Motion to File Notice of Supplemental Authority: *Second Circuit's Opinion in* Vitagliano. | 984-1011 |
| 50-3 | Exhibit C to Motion to File Notice of Supplemental Authority: *Fifth Circuit's Decision in* Braidwood Mgmt., Inc. | 1012-1053 |
| 55 | Notice of Supplemental Authority re *303 Creative LLC v. Elenis* | 1072-1148 |
| 58 | Opinion and Order Granting Motion to Dismiss | 1156-1182 |
| 59 | Judgment | 1183 |
| 60 | Notice of Appeal | 1184-1185 |